Filed 8/18/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| JAMES SAFECHUCK, | B309450 |
| Plaintiff and Appellant, | Los Angeles County<br>Super. Ct. No. BC545264 |
| v. | |
| MJJ PRODUCTIONS, INC., et al., | |
| Defendants and Respondents. | |
| WADE ROBSON, | B308602, B313436 |
| Plaintiff and Appellant, | Los Angeles County<br>Super. Ct. No. BC508502 |
| v. | |
| MJJ PRODUCTIONS, INC., et al., | |
| Defendants and Respondents, | |
| LILY CHANDLER et al., | |
| Respondents. | |

APPEALS from judgments and an order of the Superior Court of Los Angeles County.  Mark A. Young, Judge.  Judgments reversed and remanded; sanctions order affirmed.

Manly, Stewart & Finaldi, John C. Manly, Vince W. Finaldi, Alexander E. Cunny; Esner, Chang, Boyer & Murphy, Holly N. Boyer and Kevin K. Nguyen for Plaintiffs and Appellants.

Kinsella Weitzman Iser Kump Holley, Kinsella Holley Iser Kump Steinsapir, Jonathan P. Steinsapir, Suann C. MacIsaac, Aaron C. Liskin, Katherine T. Kleindienst; Greines, Martin, Stein & Richland and Alana H. Rotter for Defendants and Respondents.

Tharpe & Howell and Eric B. Kunkel for Respondents Lily Chandler and Tabitha Rose Marks.

_____

## SUMMARY

The principal issue in these cases is whether two corporations, wholly owned by the late entertainer Michael Jackson, had a legal duty to protect plaintiffs from sexual abuse Jackson is alleged to have inflicted on them for many years while they were children. The corporations say they had no duty to protect plaintiffs from Jackson because of their corporate structure, that is, "because they had no ability to control Jackson—their sole owner—or his interactions with [plaintiffs]. Parties cannot be liable for neglecting to exercise powers they simply do not have."

Following the guidance in *Brown v. USA Taekwondo* (2021) 11 Cal.5th 204 (*Brown*), we conclude a corporation that facilitates the sexual abuse of children by one of its employees is not excused from an affirmative duty to protect those children merely because it is solely owned by the perpetrator of the abuse. The corporations say these are "idiosyncratic circumstances," and perhaps they are. There is certainly no comparable case law to

2

recite. But it would be perverse to find no duty based on the corporate defendant having only one shareholder. And so we reverse the judgments entered for the corporations.

One of the plaintiffs also appeals a sanctions order and discovery rulings granting protective orders to nonparty witnesses. We find no abuse of discretion in those rulings.

## PROCEDURAL BACKGROUND

James Safechuck filed his original complaint against MJJ Productions, Inc. and MJJ Ventures, Inc. (defendants or the corporations) in May 2014, when he was 36 years old. Wade Robson filed his complaint in May 2013, at the age of 30. Their lawsuits were dismissed on demurrer and summary judgment, respectively, based on the statute of limitations, but legislative changes while their appeals were pending made their lawsuits timely, and the cases were returned to the trial court. (*Safechuck v. MJJ Productions, Inc.* (2020) 43 Cal.App.5th 1094.)

The trial court sustained defendants' demurrer without leave to amend in Safechuck's case and granted summary judgment to defendants in Robson's case. Both plaintiffs appealed, and Robson also appealed a discovery sanctions order against his counsel. The parties requested we consolidate the two cases for oral argument. We consolidated the cases, as both cases present the same principal issue concerning the existence of a duty owed by the corporations to plaintiffs.

## FACTS

### 1. The Safechuck Case

We describe the facts as alleged in the operative complaint since the trial court sustained a demurrer without leave to amend.

3

### a. The abuse allegations

In late 1986 or early 1987, when he was nine years old, plaintiff Safechuck was hired to work on a Pepsi commercial that featured Michael Jackson. Several months later, Jackson wrote plaintiff a letter on one of defendants' stationery. After that, plaintiff and his family were invited to dinner at Jackson's home on Hayvenhurst Avenue in Encino. The invitation was made by Jackson through Jolie Levine. Ms. Levine was then Jackson's secretary and personal assistant "and an employee/managing agent" of one of the defendants. During the visit, when they were alone, Jackson gave plaintiff presents (a globe and $700).

After this dinner, Jackson and Safechuck spoke frequently on the telephone and visited each other's homes. Jackson became like a part of plaintiff's family.

In 1988, when plaintiff was 10 years old, Jackson invited him to a Pepsi convention in Hawaii featuring the commercial they had appeared in, and the two appeared on stage together. Jackson and defendants made all the arrangements and paid all the expenses for the trip for plaintiff and his mother. During this trip, Jackson asked plaintiff to sleep over in his room, but plaintiff's mother would not allow it.

In March 1988, plaintiff and his mother went to New York to attend a Broadway show with Jackson. Ms. Levine again made all the arrangements through defendants, and Jackson and/or defendants paid all expenses for the trip. Jackson and defendants also arranged for plaintiff and his parents to travel to Pensacola, Florida and stay in houses Jackson and defendants had rented there. Plaintiff stayed with Jackson, and his parents stayed in one of the other houses.

4

In 1988, plaintiff and his mother spent six months with Jackson on tour. Jackson and MJJ Productions made all the arrangements and paid all the expenses, with Ms. Levine as the "point person." The first incident of sexual abuse occurred in June 1988, during this six-month tour. In Jackson's hotel room in Paris, Jackson told plaintiff he "was going to change Plaintiff's life by showing him how to masturbate." Jackson demonstrated on himself, and then made plaintiff try. Jackson later told plaintiff other sexual acts were a way of "showing love." Plaintiff began sleeping in Jackson's bed regularly during the rest of the tour, and the abuse continued.[1]

From 1988 through 1992, Jackson abused plaintiff hundreds of times in various locations. Jackson performed a "marriage" with plaintiff with a ring and a signed document to pretend they got married. He also trained plaintiff to exchange "declarations of love" with him, and plaintiff developed a significant emotional attachment to Jackson.

Whenever plaintiff visited Jackson's Neverland Ranch, he slept in Jackson's bedroom. They would "mess up" another bedroom to make it seem as if plaintiff had slept there. Jackson

---

[1] Jackson kissed plaintiff's genitals and had plaintiff rub and suck Jackson's nipples as he masturbated. Jackson "liked to have Plaintiff bend over on all fours and then [Jackson] would grab Plaintiff's butt cheeks and spread them open with one hand, and masturbate himself with the other. [Jackson] referred to this activity as 'selling me some,' because [he] would give Plaintiff jewelry after he did this, as a 'reward.'" Jackson also taught plaintiff code words so others would not know they were talking about their sexual activities, and would scratch the inside of plaintiff's hand as a sexual cue. On two occasions, Jackson inserted his finger into plaintiff's anus.

5

also installed chimes—and later video cameras—in the hallway to his bedroom to be warned when people approached. Jackson had a secret closet in his bedroom that required a passcode, and he would often abuse plaintiff there. He ran "drills" with plaintiff so plaintiff could practice dressing quickly and running away quietly.

Jackson repeatedly instructed plaintiff to deny everything if asked about the abuse, and told plaintiff not to tell anyone about their relationship. Jackson told plaintiff he "did not have to answer questions about what they did"; he should "be vague and not give real answers to questions"; and if police ever told him Jackson confessed, they were lying and trying to trick him. Jackson repeatedly told plaintiff their participation in sexual acts was plaintiff's idea, and nothing would happen to him if he lied to other people. Jackson reminded plaintiff on a constant basis that if anyone discovered the abuse, their "futures would be over."

Mariano Quindoy was the estate manager at the Neverland Ranch and an employee of defendant MJJ Productions from May 1989 to April 1990. He stated he had witnessed several incidents of suspicious activity at the Neverland Ranch, including finding Jackson's and plaintiff's underwear lying next to Jackson's bed. He also saw Jackson put his hand down the front of plaintiff's shorts while the two were in the jacuzzi. Mr. Quindoy heard gossip among the Neverland staff that Jackson was "having an affair" with plaintiff and they were sleeping together. He also stated Norma Staikos told him and his wife never to leave children alone with Jackson. (Ms. Staikos was executive director of Mr. Quindoy's employer, MJJ Productions.)

Blanca Francia was Jackson's personal maid and an MJJ Productions employee. She witnessed Ms. Staikos arrange

6

meetings between Jackson and children and their families. She stated Ms. Staikos would arrange for a limousine to pick up plaintiff and other children and take them to see Jackson at Jackson's condominium in Century City.

Orietta Murdock was an assistant to Ms. Staikos (and to Ms. Staikos's predecessor). Ms. Murdock heard about Jackson's reputation regarding children soon after she started working for MJJ Productions in September 1989. Ms. Murdock stated that, while Ms. Staikos was giving her a tour of Neverland, Ms. Staikos told Ms. Murdock never to leave her son alone with Jackson.

Plaintiff's complaint also describes "a transition period" after plaintiff turned 12 years old, during which Jackson began to focus his attention on a younger boy and began "to prepare Plaintiff for separation." When plaintiff fully reached puberty, the sexual abuse finally stopped. The complaint goes on to allege that Jackson remained active in plaintiff's life, with the relationship tapering off after plaintiff reached the age of 17; and describes various events and plaintiff's life and feelings up to and after Jackson's death.

b.    **The allegations of defendants' involvement in the sexual abuse**

The complaint alleges Jackson formed MJJ Productions "as his primary business entity" that held most or all of the copyrights to Jackson's music and videos. Jackson formed MJJ Ventures "in part for the purpose of employing Plaintiff to work with [Jackson] on various projects." Jackson was "the president/owner and a representative/agent" of both defendants.

Plaintiff alleges Jackson acted "with the full knowledge, consent and cooperation" of defendants, "who were his co-

7

conspirators, collaborators, facilitators and alter egos for the childhood sexual abuse alleged." Defendants were held out as businesses dedicated to creating and distributing Jackson's multimedia entertainment, but "actually served dual purposes. The thinly-veiled, covert second purpose . . . was to operate as a child sexual abuse operation, specifically designed to locate, attract, lure and seduce child sexual abuse victims. In fact, under this dual purpose, [Jackson] and a select few managing agents/employees of [defendants'] inner circle designed, developed and operated what is likely the most sophisticated public child sexual abuse procurement and facilitation organization the world has known."

Ms. Staikos "exercised a significant degree of control over [Jackson's] affairs in her capacity as the Executive Director" of MJJ Productions. For example, when Ms. Staikos denied a request for a raise by Ms. Murdock, and Ms. Murdock appealed to Jackson, Ms. Staikos terminated Ms. Murdock for doing so. Jackson later admitted "that Ms. Staikos had forced [him] to agree to the termination against his wishes."

Defendants knew or had reason to know that Jackson "had engaged in unlawful sexually-related conduct with minors in the past, and/or was continuing to engage in such conduct with Plaintiff, and failed to take reasonable steps, and implement reasonable safeguards, to avoid" such conduct by Jackson in the future.

The complaint alleges defendants concealed the facts concerning Jackson's sexual misconduct from plaintiff, his parents, law enforcement authorities and others, and implemented measures making his conduct harder to detect, including "[p]lacing [Jackson] in a separate and secluded

8

environment . . . in charge of young boys"; allowing him to come into contact with minors without adequate supervision; and holding him out to plaintiff, his parents and others "as being in good standing and trustworthy."

Plaintiff and other minors "were regularly trained and mentored by" Jackson, an agent of defendants, "and were cared for by staff of [defendants] who were knowingly placed in contact with these minors and hired to provide care for these minors, including but not limited to: cleaning services, food preparation, maid services, transportation services, and scheduling services."

The complaint alleges defendant entities were "created to, at least in part, provide for the welfare and safety of minor children." Their boards of directors and officers "conferred substantial actual and ostensible authority" on Jackson, permitting him to have solitary contact with plaintiff, allowing plaintiff and other minors to sleep in his bed, allowing Jackson to train and coach minors, travel with them and "have authority over those minors as an employment superior and supervisor." Defendants "employed individuals who were responsible for supervising [Jackson] and the minors in his charge."

Specifically, during the time plaintiff was being abused, Ms. Staikos and Ms. Levine "were placed in a role within [defendants] whereby the safety, welfare, and well-being of all minor children entrusted to Defendants was Ms. Staikos and Ms. Levine's primary responsibility." Ms. Staikos and Ms. Levine "had the authority and ability to limit [Jackson's] access to minor children" by requiring parents to be present when children were with Jackson; reporting Jackson to law enforcement; enforcing rules requiring other employees to report Jackson to law enforcement if they suspected abuse; and implementing

9

procedures limiting Jackson's access to children. Plaintiff's parents "were assured by Ms. Staikos and Ms. Levine, that their children would be safe, taken care of, and cared for, while they were in contact with [Jackson]."

### c. The demurrer

Based on the allegations just recited, the operative third amended complaint alleged six causes of action: intentional infliction of emotional distress; negligence; negligent supervision; negligent retention/hiring; negligent failure to warn, train or educate; and breach of fiduciary duty.

Defendants demurred to the operative complaint in September 2020. Defendants' principal argument was that plaintiff's theories of liability all "hinge on the proposition that the Corporations had the ability to control Jackson—their owner, president, and sole shareholder—and prevent the alleged molestation." Defendants argued Jackson as sole shareholder exercised complete control over defendants, not the reverse. Defendants "therefore had no ability—and thus no legal duty—to control or supervise Jackson and somehow protect [plaintiff] from him."

### d. The trial court's ruling

The trial court sustained defendants' demurrer without leave to amend.

As to the negligence causes of action, the court concluded that plaintiff did not sufficiently allege a special relationship between himself and defendants, and "[e]ven if there was a special relationship, a legal duty only exists where a defendant has an actual ability to control the person who needs to be controlled." As the sole shareholder of defendants, "Jackson had absolute legal control over the entities and everyone employed by

10

them." "Since Defendants have no ability to control Jackson regarding his alleged sexual abuse of Plaintiff, there is no legal duty of care between the parties and the negligence causes of action fail as a matter of law."

The court found the negligence claims failed for additional reasons. The court also found the breach of fiduciary duty claim failed because defendants owed no fiduciary duty as plaintiff's employers, and the intentional infliction of emotional distress claim failed because corporations cannot be direct perpetrators of sex abuse.

The court entered judgment for defendants and against Safechuck on October 27, 2020, and Safechuck filed a timely notice of appeal.[2]

## 2.    The Robson Case

Robson's operative complaint alleged the same causes of action as the Safechuck complaint.

Defendants sought summary judgment in December 2020. They contended all the claims failed for lack of causation; the negligence claims failed because defendants had no duty of care to Robson; the emotional distress claim failed because defendants themselves did not engage in extreme and outrageous conduct; and the breach of fiduciary duty claim failed for lack of a fiduciary relationship.

Before defendants moved for summary judgment, the trial court granted four protective orders at the behest of nonparty witnesses, denied a protective order Robson sought, and awarded

---

[2]    In the Safechuck case (No. B309450), the corporations requested judicial notice of documents filed in probate proceedings related to Jackson's estate. We grant these requests. (Evid. Code, § 452, subd. (d).)

sanctions against Robson's counsel.  We relate the pertinent facts surrounding those orders in part 6 of our legal discussion.

### a.     The abuse evidence

Plaintiff Robson was born in Australia in 1982.  He became fascinated with Jackson after seeing a music video at age two, began emulating his dance moves, and became obsessed with Jackson and dancing over the next few years.  Plaintiff met Jackson as a prize for winning a dance contest in 1987, and danced on stage with Jackson at a concert the following night.

In 1990, the Robson family visited the United States, and plaintiff's mother, Joy Robson, got in touch with Ms. Staikos, Jackson's personal assistant at MJJ Productions.  Through Ms. Staikos, Jackson invited the Robsons to his recording studios, and Jackson then invited the family to Neverland Ranch for the weekend.  Plaintiff testified the sexual molestation started during this 1990 trip, when he was seven years old, and continued until he was 14.  Robson's mother was aware Robson slept in Jackson's bed, but had no concerns because she "just automatically trusted him [Jackson]" at the time.

In September 1991, Joy Robson moved to the United States with plaintiff and his sister Chantal to pursue plaintiff's career in the entertainment industry.  Defendants successfully sponsored plaintiff for an H-1B visa allowing him to work in the United States, and hired plaintiff as an employee.  In that capacity, plaintiff performed alongside Jackson in music videos and photo shoots.

At his deposition, Robson described the sexual abuse in vivid detail (fondling Robson's penis, kissing, giving and receiving oral sex, an incident of attempted anal sex, and so on) and where it occurred (at the Neverland Ranch in Jackson's bedroom, in the

12

Jacuzzi, the dance studio and on golf cart rides; at two of Jackson's condominiums; in cars; at the Robson condominium in Hollywood; at a recording studio; in Jackson's trailer on the set of a Pepsi commercial; at hotels in Studio City and Las Vegas).

### b. The corporate structure evidence

Jackson was the sole shareholder of defendants MJJ Productions, Inc. and MJJ Ventures, Inc. until his death. Jackson used MJJ Productions as the corporation that furnished his services as a recording artist, owned copyrights and collected royalties on the exploitation of those recordings. MJJ Ventures was created to be a partner in and provide Jackson's services in a joint venture with Sony Music Entertainment. Defendants also provided other services for Jackson as described *post*.

Jackson was the sole director of both defendants until June 1, 1994, when he amended the bylaws to authorize an increase to four directors; the other three remained directors through at least the end of 1997. According to the bylaws of the corporations, the boards managed the corporations' affairs. For MJJ Productions, the bylaws stated any and all directors could be removed without cause as provided in Corporations Code section 303, subdivision (a).

### c. The evidence of defendants' involvement in the sexual abuse

The corporations did not own any interest in Jackson's Neverland Ranch or other residences he owned in Los Angeles. However, they employed Jackson's household and security staff, including the staff at the ranch and his other residences.

Ms. Staikos managed the day-to-day operations of the corporations and oversaw Jackson's household and security staff. Ms. Staikos was in control of "[a]ll the comings and goings, rules,

13

regulations," including policy; "[s]he gave the direction of [Jackson's] wants." In April 1991, Ms. Staikos distributed to all employees an employee handbook for MJJ Productions, including provisions on security and safety.

Ms. Staikos made the arrangements for visits by Jackson's guests, including gifts for Robson and other guests of Jackson's. Robson testified that Ms. Staikos "was always organizing most everything that [Jackson] and I did together, meaning, when we were going to get together, where we were going to meet, how I was going to get there, meaning, either sending a car to pick me up or just organizing the details of where I, where I needed to be at a certain time in order to be with [Jackson]. Organizing my flights when I was coming from Australia to Los Angeles."

Defendants' employees transported children in company vehicles, provided security during times when children were present at the Neverland Ranch, and facilitated communications between Robson and Jackson, sending packages to the Robsons and faxing messages to Robson from Jackson.

Ms. Staikos was in charge of household policies and procedures; was responsible for handling the discipline, employment and coordination of defendants' employees; and could hire and fire employees without Jackson's approval. Defendants' employees were required to keep the personal or business affairs of Jackson and his companies confidential.

Employees of defendants witnessed the sexual abuse of Robson or circumstances suggesting sexual abuse. Defendants' security guard, Charli Michaels, saw Jackson put his hand on Robson's crotch area while they were on the amusement park rides at the Neverland Ranch. On another occasion, she saw Jackson holding Robson's genitals in the dance studio at the

14

ranch. Several of defendants' employees testified that Jackson had children sleeping overnight in his bed several times a week, and that Robson slept with Jackson in Jackson's bedroom. Defendants' employees would find Jackson's and Robson's clothing and underwear on the floor around Jackson's bed. One employee testified that it "wasn't a secret" that "the kids were sleeping in Jackson's room with him," and another said, "[e]verybody knew he did that."

Defendants' security staff joked that Jackson did not have any girlfriends "because he likes little boys. He likes little white butts." Security officer Ms. Michaels remembered Ms. Staikos commenting about Jackson's obsession with his "little boyfriends." Defendants' employees were routinely sent to buy gifts and toys for Jackson's "little friends," using defendants' funds, including with a credit card issued by MJJ Productions.

Ms. Michaels testified it was her duty to visually inspect the interior of Jackson's vehicles when he arrived at the gate, to ensure he was not under duress from a gunman or kidnapper. Ms. Staikos changed security procedures, with the result that "security around Michael was dangerously loosened when he was on the estate." At the same time, Ms. Michaels began to notice Jackson arriving at the ranch alone with young boys "under what can only be described as strange circumstances."

Jackson would drive up to the house at night, usually between 10:00 p.m. and 2:00 a.m., with a young child and run into the house. This happened "[t]oo many [times] to keep count of." On more than one occasion, she saw a young boy crouching between the seats as if trying to hide from view. Almost all of these late-night arrivals were preceded by a call from Ms. Staikos to alert security that Jackson would be arriving, and they were to

15

open the gate to let him go through and then call Ms. Staikos to say he had arrived. Security personnel were to stay away from the house so they would not see who was getting out of the car.

Defendants implemented policies that allowed Jackson to be alone with children. Ms. Staikos instructed security staff to "keep your distance" when Jackson had "play time" with children in various areas of the Neverland Ranch. Staff were instructed to keep parents from children while the children were with Jackson. Parents were required to sleep in the guest quarters, not the main house. Defendants' staff would take parents shopping or winetasting away from the ranch when Jackson was there with a child.

No one reported the abuse to the police or any authorities.

### d.    The trial court's ruling

The trial court concluded there was no evidence defendants exercised control over Jackson; the evidence demonstrated defendants had no legal ability to control Jackson because of Jackson's "complete and total ownership of the corporate defendants"; "[w]ithout control, there is no special relationship or duty that exists between Defendants and [Robson]"; and there was "no evidence of misfeasance by Defendants." All the negligence claims therefore failed.

The court also found defendants were entitled to summary adjudication of Robson's claim for intentional infliction of emotional distress. The court concluded Robson was attempting to hold defendants "directly liable under a theory of procurement, i.e. direct liability for sexual abuse," and "such claims are not available against entities." As for the breach of fiduciary duty claim, the court found there was no evidence Robson "was in a

16

trusting relationship with the individual corporate Defendants, even if there is evidence of such a relationship with Jackson."

The trial court entered judgment for defendants on May 5, 2021, and Robson filed a timely notice of appeal.

## DISCUSSION

### 1.      The Standard of Review

A demurrer tests the legal sufficiency of the complaint.  We review the complaint de novo to determine whether it alleges facts sufficient to state a cause of action.  For purposes of review, we accept as true all material facts alleged in the complaint, but not contentions, deductions or conclusions of fact or law.  We also consider matters that may be judicially noticed.  (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

A defendant moving for summary judgment must show "that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to the cause of action."  (Code Civ. Proc., § 437c, subd. (p)(2).)  Summary judgment is appropriate where "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  (*Id.,* subd. (c).)

Our Supreme Court has made clear that the purpose of the 1992 and 1993 amendments to the summary judgment statute was " 'to liberalize the granting of [summary judgment] motions.' "  (*Perry v. Bakewell Hawthorne, LLC* (2017) 2 Cal.5th 536, 542.)  It is no longer called a "disfavored" remedy.  (*Ibid.*)  "Summary judgment is now seen as 'a particularly suitable means to test the sufficiency' of the plaintiff's or defendant's case."  (*Ibid.*)  On appeal, "we take the facts from the record that was before the trial court . . . .  ' "We review the trial court's

17

decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained." ' " (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037.)

## 2. Safechuck and Robson: The Duty Issue

In *Brown,* the Supreme Court gave directions on "how courts should decide whether a defendant has a legal duty to take action to protect the plaintiff from injuries caused by a third party." (*Brown, supra,* 11 Cal.5th at p. 209.) *Brown*'s directions govern how we should decide whether the corporate defendants had a legal duty to protect plaintiffs—children whom defendants sometimes employed—from alleged sexual abuse by the corporate defendants' own employee, owner, and director.

*Brown* directs a two-step inquiry. "First, the court must determine whether there exists a special relationship between the parties or some other set of circumstances giving rise to an affirmative duty to protect. Second, if so, the court must consult the factors described in *Rowland* [*v. Christian* (1968) 69 Cal.2d 108 (*Rowland*)] to determine whether relevant policy considerations counsel limiting that duty." (*Brown, supra,* 11 Cal.5th at p. 209.)

The circumstances here created a "special relationship" that gave rise to an affirmative duty of the corporations to protect the minor plaintiffs from sexual abuse the corporations knew or suspected was occurring. Our examination of the factors described in *Rowland* does not counsel limiting defendants' duty.

### a. Legal background

*Brown* explains the underlying principles.

"To establish a cause of action for negligence, the plaintiff must show that the 'defendant had a duty to use due care, that he

18

breached that duty, and that the breach was the proximate or legal cause of the resulting injury.' " (*Brown, supra,* 11 Cal.5th at p. 213.) A legal duty of care is the threshold requirement for recovery. (*Ibid.*) The existence of a duty is a question of law for the court. (*Ibid.*)

Civil Code section 1714 sets forth the " 'general rule' " governing duty. (*Brown, supra,* 11 Cal.5th at p. 213.) Section 1714 "establishes the default rule that each person has a duty 'to exercise, in his or her activities, reasonable care for the safety of others.' " (*Brown,* at p. 214.) But section 1714 has limits: "Generally, the 'person who has not created a peril is not liable in tort merely for failure to take affirmative action to assist or protect another' from that peril." (*Brown,* at p. 214.) Examples are a person "who stumbles upon someone drowning" or "who stumbles upon a mugging." (*Ibid.*) "Generally, ' "one owes no duty to control the conduct of another, nor to warn those endangered by such conduct." ' " (*Ibid.*)

The "no-duty-to-protect rule is not absolute, however; [the Supreme Court] has recognized a number of exceptions." (*Brown, supra,* 11 Cal.5th at p. 215.) "Under some circumstances, a defendant may have an affirmative duty to protect the plaintiff from harm at the hands of a third party, even though the risk of harm is not of the defendant's own making." (*Ibid.*)

One of the exceptions is that "a person may have an affirmative duty to protect the victim of another's harm if that person is in what the law calls a 'special relationship' with either the victim or the person who created the harm." (*Brown, supra,* 11 Cal.5th at p. 215.) "A special relationship between the defendant and the victim is one that 'gives the victim a right to expect' protection from the defendant, while a special

relationship between the defendant and the dangerous third party is one that 'entails an ability to control [the third party's] conduct.' " (*Id.* at p. 216.)

Examples of relationships between the defendant and the victim that give the victim a right to expect protection from the defendant are relationships "between parents and children, colleges and students, employers and employees, common carriers and passengers, and innkeepers and guests." (*Brown, supra,* 11 Cal.5th at p. 216.) "The existence of such a special relationship puts the defendant in a unique position to protect the plaintiff from injury. The law requires the defendant to use this position accordingly." (*Ibid.*)

In *Brown,* the court summarized: This rule "extends a right of recovery to individuals in relationships involving dependence or control, and who by virtue of those relationships have reason to expect the defendant's protection." (*Brown, supra,* 11 Cal.5th at p. 220.) " ' "[A] typical setting for the recognition of a special relationship is where 'the plaintiff is particularly vulnerable and dependent upon the defendant who, correspondingly, has some control over the plaintiff's welfare.' " ' " (*Ibid.*) "Where such a special relationship exists between the defendant and a minor, the obligation to provide such protection and assistance may include a duty to protect the minor from third party abuse." (*Id.* at pp. 220–221.)

b.      **These cases:  the special relationship**

We are presented here with "special circumstances" that burdened defendants with a special obligation to offer protection or assistance (*Brown, supra,* 11 Cal.5th at p. 220) to plaintiffs. Plaintiffs were young children—by definition, vulnerable and dependent upon the adults who took care of them and supervised

20

them.  Defendants sometimes employed these children.  Plaintiffs were often in the care and under the supervision of defendants' employees, wholeft them secluded with Jackson, sometimes for hours on end.  Defendants' employees arranged for plaintiffs to be guests in locations staffed and run by defendants; they organized and facilitated occasions for the children to be alone with Jackson; and they were aware of the risk that Jackson would molest the children.

Jackson did not meet the plaintiffs "incidentally"; Jackson did not unwittingly "stumble upon" them.  Defendants employed both Jackson and the minor plaintiffs and made the arrangements enabling Jackson to be alone with them.  In Robson's case, defendants sponsored Robson's H-1B visa application, enabling them to employ him in the United States.  Defendants' assertion that the alleged molestation "occurred in places that the Corporations had no interest or control" ignores allegations and evidence that the molestation occurred in many places, including in residences that were run and staffed by defendants' employees.  It is difficult to conceive a special relationship involving more foreseeable victims, or victims more dependent and vulnerable than these plaintiffs.  Plaintiffs had every right to expect defendants to protect them from the entirely foreseeable danger of being left alone with Jackson.

Defendants cite many cases which they say support the proposition that, for a "special relationship" to exist, the defendant must have the ability to control the third party's conduct, and there is no duty where there is no ability to control the dangerous third party.  None of the cases defendants cite supports that broad proposition, nor does any other California authority.  In California, a special relationship between a

21

defendant and a plaintiff may give rise to the duty to protect the plaintiff from foreseeable violence irrespective of the defendant's ability to control the dangerous third party. We recited from *Brown* above the rule that a special relationship may exist *either* (1) between the defendant and the victim, giving " 'the victim a right to expect' protection from the defendant," *or* (2) between the defendant and the dangerous third party, giving the defendant " 'an ability to control [the third party's] conduct.' " (*Brown, supra,* 11 Cal.5th at p. 216.)

Three years before its decision in *Brown*, the Supreme Court in *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607 held the defendant owed a duty to protect the plaintiff *without deciding* whether defendant also had a duty to control the dangerous third party. (*Regents*, at p. 620 ["Here, we have focused on the [defendant's] duty to protect [the plaintiff] from foreseeable violence. Having concluded [the defendant] had a duty to protect [the plaintiff] under the circumstances alleged, we need not decide whether [the defendant] had a separate duty to control [the third party's] behavior to prevent the harm."].)

Likewise, one of the cases defendants cite, *Musgrove v. Silver* (2022) 82 Cal.App.5th 694, 706 (*Musgrove*) states in clear terms that a defendant has a duty to protect or assist another if there is a special relationship "with either (1) the third person who injures the plaintiff or (2) the plaintiff herself. [Citations.] The first type of special relationship runs between the defendant and the third person who injured the plaintiff, and obligates the defendant *to control* the third person. [Citations.] The second type of special relationship runs between the defendant and the plaintiff, and obligates the defendant *to protect* the plaintiff."

22

None of the cases defendants cite departs from the rule that a defendant in a special relationship with a vulnerable, dependent plaintiff has a duty to protect that plaintiff. (See, e.g., *K.G. v. S.B.* (2020) 46 Cal.App.5th 625, 631 [parents have no duty to control adult children]; *Barenborg v. Sigma Alpha Epsilon Fraternity* (2019) 33 Cal.App.5th 70, 79 [national fraternities have no duty to control local chapters or their members].) The duty analysis in these cases that defendants cite was different, first, because the victims in those cases were adults, not children, and second, because there was no special relationship between the defendants and the victims. Here, the victims were children, and there was a special relationship between the defendants and the victims.

Defendants argue that their employment relationship with plaintiffs did not establish a special relationship. They concede that "in a run-of-the-mill employment relationship," the employer has the ability to control employees but they say they had no ability to control Jackson because he was their sole shareholder. Defendants do not tell us where they propose we draw the line between "run-of-the-mill employment" that gives rise to a duty to protect and other employment that does not. Defendants offer no convincing rationale for why the no-duty line should be drawn where the employer is a corporation with only one shareholder. More to the point, defendants' employment of plaintiffs is only one of several circumstances giving rise to the special relationship here.

We find particularly inapt defendants' citation to *Musgrove, supra,* 82 Cal.App.5th 694 to support the argument that plaintiffs' employment relationship with them was "limited" and did not create "a wide-reaching special relationship," and the

plaintiffs' "interactions" with Jackson were "outside the scope of Robson's narrow employment, at locations where the Corporations had no control." In *Musgrove*, *supra,* at page 712, the court found an employer had no employment-related duty to protect the adult plaintiff who drowned after using alcohol and cocaine while in a private bungalow after work hours during a company-paid trip. We see no analogy between the duty an employer may owe to an intoxicated adult in a private bungalow after work hours and the duty defendants owed to the young children they sometimes employed, housed, fed, cared for, and often arranged to be left alone with Jackson.

We could go on distinguishing cases, but the point is there are no comparable precedents. Here, defendants employed Jackson and knew he was a danger to young boys. Defendants employed the child victims and employed the staff who ran Jackson's residences and adopted policies and operations enabling Jackson to be alone with plaintiffs. Defendants' employees, officers and directors had some control over and responsibility for plaintiffs' welfare, and defendants were on notice of the danger. They were best situated to prevent the alleged injuries. (See *Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1153.) It is these "particular facts and circumstances" (*Brown, supra,* 11 Cal.5th at p. 221) that make these cases different from all the other cases defendants cite.

So far, our analysis has focused on the special relationship between defendants and plaintiffs giving plaintiffs the right to expect protection from Jackson. We now address the special relationship between defendants and Jackson. We reject defendants' contention they had no control over plaintiffs' welfare on the theory they were unable to control Jackson because he was their sole shareholder. Defendants say Jackson had the

24

authority to remove or fire anyone—any director, any officer or any employee with the temerity to make any attempt to protect the minor victims from his sexual abuse.  Therefore, they say, they are absolved as a matter of law from the duty any other entity might otherwise have to protect the child victims.

Any director, employee or other agent of defendants who knew of or suspected abuse could have done something to protect plaintiffs' welfare:  issued warnings, gone to police, confronted Jackson.  Yes, the likely consequence of protecting plaintiffs would have been termination of employment or removal from the board of directors.  But a director or employee's risk of removal or termination if they acted to protect plaintiffs does not mean they *could not* act.  It means they risked losing their positions and compensation if they acted.  That is not the same as an inability to act.

*Brown*, in discussing the no-duty-to-act rule, explained that one reason why the rule has endured in the common law is the difficulty " ' "of setting any standards of unselfish service to fellow men" ' " and " ' "making any workable rule to cover possible situations where fifty people might fail to rescue." ' "  (*Brown, supra,* 11 Cal.5th at pp. 214–215.)  However, we find no difficulty in setting a legal duty to act under the circumstances here, and we do not believe that any group of 50 people would fail to act under these circumstances.  Among any hypothetical group of 50 people, some or all might be reluctant to act due to guilt, shame, or fear of consequences.  But we do not believe we set too high a standard of "unselfish service" to the children of "fellow men" in concluding defendants' agents had a duty to jeopardize their positions and compensation to protect plaintiffs.

### c.    This case:  the *Rowland* factors

That brings us to the second step of the *Brown* inquiry: determining "whether relevant policy considerations counsel limiting" defendants' affirmative duty to protect plaintiffs. (*Brown, supra,* 11 Cal.5th at p. 209.)

The *Rowland* considerations include "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Rowland, supra*, 69 Cal.2d at p. 113.)  The inquiry "hinges not on mere rote application of the[] separate so-called *Rowland* factors, but instead on a comprehensive look at the ' " ' "sum total" ' " ' of the policy considerations at play in the context before us." (*Southern California Gas Leak Cases* (2019) 7 Cal.5th 391, 399.)

As *Brown* tells us, " 'In considering [the *Rowland* factors], we determine "not whether they support an exception to the general duty of reasonable care on the facts of the particular case before us, but whether carving out an entire category of cases from that general duty rule is justified by clear considerations of policy." ' " (*Brown, supra,* 11 Cal.5th at p. 221.)

Defendants contend that we should carve out cases "where the alleged perpetrator completely controlled the defendant entities."  Defendants' arguments are again premised on the notion they "had no control over" Jackson, citing "basic tenets of corporate hierarchy."  They raise the specter of "low-level

26

employees" being exposed to defamation liability and that future harm would not be prevented because employees "would likely be fired and replaced by another," and that "it is doubtful that insurance would be available." They conclude by saying public policy "does not warrant imposing a tort duty on corporations to police their sole shareholders . . . , as a loophole for plaintiffs who fail to timely sue the perpetrator or his estate."

Defendants scarcely mention one of the primary policy considerations: the foreseeability of sexual abuse where minors are both employed by corporations and are frequently left alone with the known or suspected perpetrator. (Cf. *Brown v. USA Taekwondo* (2019) 40 Cal.App.5th 1077, 1098 ["It is reasonably foreseeable some coaches, allowed to be alone with youth athletes, would sexually abuse the athletes during road trips and overnight stays."].) Defendants omit any reference to the degree of certainty that the plaintiffs suffered injury. They assert there was "*no* close connection" between their conduct and plaintiffs' sexual abuse, blaming it all on families seeking a personal relationship with Jackson and allowing their children to sleep in Jackson's bedroom. They attach no moral blame to their conduct, insisting they could not protect plaintiffs.

We do not agree. It is obvious to us that the policy considerations identified in *Rowland* do not justify—clearly or otherwise—carving out solely-owned corporations from the affirmative duty to protect and to warn that arises from the special relationships we have found to be present in these cases. On the contrary, the " ' " ' "sum total" ' " ' of the policy considerations at play in the context before us" (*Southern California Gas Leak Cases, supra,* 7 Cal.5th at p. 399) demands

that we decline to find a categorical exception based on corporate structure.

### 3. Safechuck and Robson: Other Negligence Issues

Defendants contend that, even if they had an affirmative duty to protect plaintiffs, the causes of action for negligent supervision, negligent retention/hiring, and negligent failure to warn, train or educate fail for other reasons. Again, none of the cases defendants cite is apt authority because the facts and legal issues were entirely different, thus driving an entirely different duty analysis. (*Coit Drapery Cleaners, Inc. v. Sequoia Ins. Co.* (1993) 14 Cal.App.4th 1595, 1599, 1605 [insurer not liable for costs of defending and settling sex harassment claim; the plaintiff did not allege negligent supervision]; *Doe v. United States Youth Soccer Assn., Inc.* (2017) 8 Cal.App.5th 1118, 1138 [youth soccer association had a duty to conduct criminal background checks of adults who would have contact with children in their programs, but no duty to warn about general risk of sex abuse; association did not know or suspect abuse by a specific person]; *Conti v. Watchtower Bible & Tract Society of New York, Inc.* (2015) 235 Cal.App.4th 1214, 1226–1227 [church had no duty to warn its congregation that one of its members had molested a child].)

### 4. Safechuck and Robson: Other Causes of Action

#### a. Intentional infliction of emotional distress

"A cause of action for intentional infliction of emotional distress exists when there is ' " ' "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." ' " ' [Citations.]

A defendant's conduct is 'outrageous' when it is so ' " 'extreme as to exceed all bounds of that usually tolerated in a civilized community.' " ' [Citation.] And the defendant's conduct must be ' " 'intended to inflict injury or engaged in with the realization that injury will result.' " ' " (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050–1051.)

Defendants assert there is no evidence of extreme and outrageous conduct, that is, no evidence their employees arranged Robson's visits "with *knowledge* and *intent* of making him available *for the purpose of being abused*." But there *is* evidence defendants knew of Jackson's dangerous proclivities; it is for a jury to decide whether defendants acted *either* with intent or with reckless disregard of the probability of causing emotional distress.

### b. Breach of fiduciary duty

"The elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, breach of fiduciary duty, and damages." (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820.) " '[B]efore a person can be charged with a fiduciary obligation, he must either knowingly undertake to act on behalf and for the benefit of another, or must enter into a relationship which imposes that undertaking as a matter of law.' " (*City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 386 (*City of Hope*).)

Here, we have concluded the special relationship between defendants and plaintiffs resulted in an affirmative duty to protect and warn plaintiffs. In other words, defendants " 'enter[ed] into a relationship which imposes' " an undertaking " 'to act on behalf and for the benefit of another' " (*City of Hope, supra,* 43 Cal.4th at p. 386), as a matter of law.

29

## 5. Robson: Causation

Defendants contend we must affirm summary judgment in Robson's case, on all causes of action, because we review the ruling of the trial court, not its rationale. They say there was no evidence their conduct was the legal cause of Robson's alleged sexual abuse. Defendants sought summary judgment on this ground, but the trial court did not reach the question, instead finding, erroneously, that defendants had no duty to protect plaintiff.

The essence of defendants' argument is that nothing defendants could have done—reporting Jackson to authorities, or warning Robson's family, or refusing to facilitate Jackson's being alone with young boys while knowing Jackson was dangerous, and so on—would have prevented the sexual abuse. As support, they point to undisputed evidence that Robson's mother believed Jackson was innocent when allegations were made in 1993 that he had molested another boy, even after the police questioned her; she was called to testify before a grand jury in 1994, and in a civil deposition; and nonetheless she continued to let Robson sleep in Jackson's bed. We fail to see how Robson's mother's belief and inaction in 1993 somehow means that *defendants'* inaction is necessarily excused for lack of causation. We reject the notion that defendants were powerless to do anything about abuse that was ongoing since 1990, including alerting the authorities and refraining from facilitating the abuse. This is a quintessential question for a jury to decide.

## 6. Robson: The Protective Orders and Sanctions Issues

Before defendants' summary judgment motion was filed, the trial court granted four discovery motions for protective orders filed by nonparty witnesses whom Robson sought to

depose. The court also denied Robson's request for a protective order that would have required a further deposition of another nonparty witness and awarded sanctions against Robson's counsel.

Robson appealed from the sanctions order, as well as the grant of the protective orders. We find no abuse of discretion in any of these orders.

### a. The Whaley deposition and sanctions order

On February 4, 2017, Robson deposed nonparty witness Leroy Whaley, the son of Ms. Levine, who worked for Jackson when Mr. Whaley was a child. Robson's counsel suspended the deposition, claiming defense counsel repeatedly made speaking objections, interrupted counsel and coached the witness.

Then Robson asked for a protective order requiring Mr. Whaley to sit for a further deposition, limiting defense counsel's objections, and requesting sanctions against defense counsel. The trial court denied the protective order and awarded sanctions against Robson's counsel.

First, the court found Robson "did not meet and confer in good faith with defendants as to the resolution of the issues presented by this motion." Robson's meet and confer letter was written by an attorney who was not at the deposition, and the letter was "simply an ultimatum" requiring defense counsel to agree within 25 hours. "Subsequent efforts by defense counsel to meet and confer were rebuffed without any serious efforts at solving the deposition issues." And Robson's counsel had also rejected defense efforts to meet and confer during the deposition and take a break to resolve issues, which the court found was "further evidence that counsel has failed to meet and confer in

31

good faith," and an "independent basis for the court to impose monetary sanctions."

Second, on the substance of Robson's motion, the trial court recounted details from the deposition, observing there were no instructions not to answer, and the "majority of the deposition did not have objections from counsel." Robson's counsel called defense counsel "obstreperous and unprofessional" more than once, "sometimes for merely stating an objection and the basis for the objection." The court observed it had read the entire deposition, and concluded defense counsel's conduct "was not obstreperous or unprofessional," and "Plaintiff's counsel's reactions to [defense counsel's] objections and conduct were not even closely proportionate to the underlying alleged misconduct."

Finally, the court concluded it was obligated to impose sanctions against Robson's counsel under Code of Civil Procedure section 2025.420, subdivision (h),[3] finding Robson's counsel "did not act with substantial justification in seeking the protective order . . . ." In addition, the court stated it was authorized under section 2023.020 to order sanctions "when a party fails to meet and confer in good faith prior to filing a motion for a protective order."[4]

---

[3] "The court shall impose a monetary sanction under Chapter 7 (commencing with Section 2023.010) against any party, person, or attorney who unsuccessfully makes or opposes a motion for a protective order, unless it finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust." (Code Civ. Proc., § 2025.420, subd. (h).)

[4] "Notwithstanding the outcome of the particular discovery motion, the court shall impose a monetary sanction ordering that

32

Robson tells us none of this, instead contending the court denied his request for a further deposition because the court thought counsel was required to state on the record that he was suspending the deposition to seek a protective order (and instead counsel said he was seeking sanctions).[5]  Robson also says the trial court focused on his counsel's conduct at *other* depositions involving heated exchanges between counsel (where Robson's counsel made statements about defense counsel's lack of legal experience or ability, belittled her appearance, made allegations about her emotional state, and so on).

The trial court referred to "gender incivility" statements, but expressly did *not* consider that evidence for purposes of Robson's motion; the court said it just wanted to remind counsel of their obligations and "eliminate this potential issue immediately."  And the court said, "Plaintiff ended the deposition without justification or explanation, and without stating that he was ending it in order to seek a protective order."  But this remark was prefaced with "furthermore," after the court gave the

---

any party or attorney who fails to confer as required pay the reasonable expenses, including attorney's fees, incurred by anyone as a result of that conduct."  (Code Civ. Proc., § 2023.020.)

[5]     Code of Civil Procedure section 2025.470 states:  "The deposition officer may not suspend the taking of testimony without the stipulation of all parties present unless any party attending the deposition, including the deponent, demands that the deposition officer suspend taking the testimony to enable that party or deponent to move for a protective order under Section 2025.420 on the ground that the examination is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses that deponent or party."

reasons we have just described.  There is no basis for finding an abuse of discretion.

### b.     The four protective orders

Robson subpoenaed four nonparties for depositions.  They were Lily Chandler, the half sister of Jordan Chandler (Jordan reported in 1993 that he was abused by Jackson, apparently the first child to do so); Tabitha Rose Marks, Jordan's former fiancée; Jonathan Spence; and Marion Fox, Spence's mother.  (Robson believes, but presented no evidence, that Spence was "one of Jackson's so-called 'little friends' " during the 1980's.)  All four sought protective orders.

As pertinent here, Spence and Fox asked that matters protected by their rights to privacy not be inquired into.  (Code Civ. Proc., § 2025.420, subd. (b)(9).)  Fox also asked that photographs designated for production in her deposition notice— all photographs of Spence taken while he was 3 through 18 years of age, and all photos depicting Jackson—not be produced. (§ 2025.420, subd. (b)(11).)  Chandler and Marks asked that their depositions not go forward at all, based on fears for their personal safety and to prevent unwarranted invasion of their constitutional privacy rights.

As to Spence and Fox, the trial court concluded:  (1) Robson failed to present admissible evidence demonstrating he seeks information that is directly relevant to his own claims.  (Robson's evidence was a declaration from his counsel of his belief that Spence was a "key percipient witness" to Jackson's sexual abuse of children, to which the court sustained objections based on hearsay, lack of foundation, lack of personal knowledge and speculation.)  The trial court also concluded (2) even if that evidence were admissible, the court would still grant the

34

protective order, because Robson was "seeking evidence that would corroborate his own allegations," and "the stated desire for corroboration of Plaintiff's own sexual abuse is not directly relevant to his claims or essential to the resolution of his case." "This is an insufficient basis to compel third parties to discuss such highly sensitive and protected private information."

As to Lily Chandler and Tabitha Rose Marks, Robson sought to depose them concerning the whereabouts of Jordan Chandler (the first child to report abuse), Jordan's interactions with Jackson in the early 1990's, and Lily and her family's interactions with Jackson.

Chandler and Marks submitted declarations under penalty of perjury. Marks (Jordan Chandler's former fiancée) stated she had no personal knowledge of what happened between Jordan and Jackson (she met Jordan in 2008) and had no knowledge of Jordan's whereabouts. Lily Chandler declared she had no specific memories of any interactions with Jackson or his employees (she was six years old at the time).

Robson argued he needed to depose Jordan Chandler because his credibility bears on Robson's credibility, and for determining whether defendants were or should have been on notice of any ongoing sexual abuse. The trial court observed the ultimate goal was to find and depose Jordan for the purpose of using evidence of his abuse to assist in proving Robson's own abuse. The court said that character evidence would be inadmissible and, with regard to the corporate defendants, Robson's complaint alleged numerous agents and employees of defendants actively participated in and witnessed Jackson's child abuse, so Robson's ultimate goal (to depose Jordan) would not be essential to Robson's claims. The court balanced privacy rights

35

against Robson's interest in obtaining information on private matters "from nonparties who have no direct knowledge of any sexual abuse," and concluded Robson did not demonstrate a compelling need for Lily Chandler's and Marks's depositions.

We find no abuse of discretion in the trial court's rulings.[6] In each case, the trial court's ruling balanced the prospective deponent's privacy rights in highly sensitive personal information against Robson's need for the information. This was in accord with *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 34.

To be clear, we express no general view or advisory opinion on the merits of Robson's contentions (1) that he is entitled to obtain discovery into whether defendants knew or should have known that Jackson posed a risk to children within defendants' care; or (2) that evidence of prior sexual abuse would be admissible under Evidence Code section 1101, subdivision (b) (exception to the ban of character evidence to prove conduct where the evidence is relevant to prove some other fact such as intent) and section 1105 (habit or custom); or (3) that Robson "is entitled to gather information concerning Jackson's repeated abuse of other children to further investigate a pattern in his grooming of victims and his subsequent sexual abuse of victims." We hold only that the trial court did not abuse its discretion when it granted the four protective orders at issue here.

---

[6] In the interest of reaching the merits, we decline to decide whether Robson forfeited his challenges to the trial court's rulings by failing to serve his opening brief and appendices, or the notice of appeal, on the prospective deponents who obtained the protective orders.

36

## DISPOSITION

The judgments are reversed and the causes are remanded to the trial court for further proceedings.  Plaintiffs shall recover their costs on appeal from the judgments.  The discovery orders and the sanctions order in the Robson case are affirmed.  Lily Chandler and Tabitha Rose Marks shall recover their costs.  Defendants shall recover costs on appeal from the sanctions order.


GRIMES, Acting P. J.

WE CONCUR:



WILEY, J.



VIRAMONTES, J.

**WILEY, J., Concurring.**

Michael Jackson totally controlled the two corporations that are the defendants in these cases. He was their sole shareholder. For tort purposes, to treat Jackson's wholly-owned instruments as different from Jackson himself is to be mesmerized by abstractions. This is not an alter ego case. This is a same ego case. For tort purposes, Jackson's corporations *were* Jackson. They did his bidding and his alone. Jackson himself owed a tort duty to the plaintiffs in this case. So did Jackson's marionettes, because Jackson's fingers held every string.

What is the tort duty? Where the expected benefit of investments in harm avoidance outweighs the burden, courts impose tort duties on defendants, but courts refrain when the burdens outweigh the expected benefits. These corporations could have taken cost-effective steps to reduce the risk of harm. They owed the children that duty in tort.

The question of whether these corporations owed a duty in tort is a question for tort law. The defendant corporations identify no tort duty precedents involving corporations wholly owned by one person. To decide this question of first impression, first principles are our first stop.

The first principle of tort duty is to minimize the social costs of accidents. People must take cost-effective steps to avoid accidents, but when the cost of harm avoidance outweighs the expected benefit, no tort duty exists. The author of this profound principle was our revered Justice Roger J. Traynor. In his 1944 *Escola* opinion, Justice Traynor saw the future and charted the way forward. *Escola* explained tort doctrine must aim to minimize the social costs of accidents. (*Escola v. Coca Cola*

1

*Bottling Co.* (1944) 24 Cal.2d 453, 462 (conc. opn. of Traynor, J.) ["public policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products"] (*Escola*); see also *Greenman v. Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 63–64 (Traynor, J.) [unanimous court adopts logic of Traynor's concurring *Escola* opinion] (*Greenman*).)

Justice Traynor's *Greenman* decision shaped national law. "Within a decade of *Greenman*, a majority of jurisdictions in the United States had adopted causes of action in strict product liability. Today all but a handful of states employ some version of products liability law." (Goldberg et al., Tort Law: Responsibilities and Redress (3d ed. 2012) p. 887.)

Shortly after *Escola*, Judge Learned Hand—another jurist in the American pantheon—expanded tort law's cost-benefit calculus beyond products liability and formalized it with mathematical precision. (See *United States v. Carroll Towing Co.* (2d Cir. 1947) 159 F.2d 169, 173 [defendant's tort duty is a function of three variables: (1) the probability of an accident and (2) the gravity of the injury from an accident, versus (3) the burden—that is, the cost—of adequate precautions]; see Posner, *A Theory of Negligence* (1972) 1 J. Legal Stud. 29, 32–33.)

Guido Calabresi is another in the line of giants. In 1970, then-Professor Calabresi revealed tort law's deep structure in his landmark book, The Costs of Accidents. Calabresi showed courts can use cost-benefit analysis to appraise whether defendants can take cost-effective steps to reduce the risk of accidents. Where the benefit of investments in harm avoidance outweighs the cost, courts should impose tort duties on defendants. But courts refrain from imposing tort duties when the costs of avoiding

2

harm outweigh the benefits. (Cf. Posner, *Guido Calabresi's The Costs of Accidents: A Reassessment* (2005) 64 Md. L.Rev. 12, 15 [Calabresi's framework approximated cost-benefit analysis].)

This approach had such power and logic that it eventually became national law. (See *Air and Liquid Systems Corp. v. DeVries* (2019) __ U.S. __ [139 S.Ct. 986, 994–995] [majority opinion determines tort duty by analyzing who is in the better position to prevent the injury, citing Calabresi, *supra*]; *id.* at p. 997 (dis. opn. of Gorsuch, J.) [dissent agrees with this approach]; see generally Sharkey, *Modern Tort Law: Preventing Harms, Not Recognizing Wrongs* (2021) 134 Harv. L.Rev. 1423, 1423, fn. 3, 1435–1444; see also *Jane IL Doe v Brightstar Residential Inc.* (2022) 76 Cal.App.5th 171, 182–185 [analyzing California cases]; *Loomis v Amazon.com LLC* (2021) 63 Cal.App.5th 466, 492–502 (conc. opn. of Wiley, J.) [analyzing California cases].)

The question in this case is whether Michael Jackson, as puppetmaster of his two wholly-owned corporations, could have taken cost-effective steps to avoid the harm the plaintiffs allege he inflicted upon them. The answer is yes. Jackson could have restrained *himself*. From a social standpoint, this harm avoidance would have been costless. It merely required law-abiding self-control, which the law expects of every person.

Jackson's two *corporations* were akin to USA Taekwondo in the *Brown* case. (See *Brown v. USA Taekwondo* (2019) 40 Cal.App.5th 1077, 1095.) These three entities—Michael Jackson's two wholly-owned corporations as well as USA Taekwondo—were in controlling positions to protect children from sexual abuse. All three entities could have established codes of conduct to prohibit sexual relationships between adults

3

and youths.  All three entities could have barred adults from being alone with youths.  So too could these entities have provided guards or chaperones to prevent improper conduct by adults.  (*Ibid.*)  All three entities were in the best position to protect against the risk of harm.  (See *id.* at p. 1094; *Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 222 [Court of Appeal took the correct approach].)

Through attorneys, Jackson's corporations tell us today these protective measures were impossible or absurd because Michael Jackson would not have wanted to adopt them, and he was the only one in charge.  But corporations cannot escape their tort duties by saying those with power do not care about safety.  It is the job of tort law to make them care.


WILEY, J.

4